MARY WASHINGTON, The, v. AYRES. See Case No. 9,229.

MASCOUTAH (BALCHELLER v.). See Case No. 792.

MASI (MASON v.). See Case No. 9,244.

MASON (ABORN v.). See Case No. 19.

---

## Case No. 9,230.

MASON et al. v. The BLAIREAU.

[2 Cranch (6 U. S.) 240.] [1]

District Court and Circuit Court, D. Maryland. 1803.

SALVAGE — DERELICT — AMOUNT ALLOWED—LEFT ON BOARD—EMBEZZLEMENT—APPRENTICE.

[1. A ship and cargo abandoned in a sinking condition by its crew at sea is saved and brought three thousand miles into port without boats or anchors and at great risk. Held, that three-fifths part of the gross value of the ship and cargo is a fair compensation to the salvors.]

[2. One man left, either by design or through carelessness, on board of a ship abandoned at sea, is thereby discharged from his contract of service, and may claim salvage for assisting in saving the vessel.]

[3. Embezzlement of salved property by any one assisting in the salvage service forfeits his share of the salvage.]

[4. An apprentice who renders salvage service is entitled to receive compensation, which is to be paid to himself and not to his master.]

This was a libel for salvage, filed in the district court of the United States for Maryland district, by [William Mason and others] the master, officers, crew, owner, and freighters of the British merchant ship the Firm, against the French ship Le Blaireau.

The facts stated in the proceedings and evidence were as follows: The ship Le Blaireau, James Anquetil, master, on a voyage from Martinique to Bordeaux, laden with sugar, on the 30th of March, 1803, at 10 o'clock at night, in lat. 35. 46 N., long. 46. west from Paris. was run down by a Spanish 64 gun ship, called the St. Julien, commanded by Francisco Mondragora, which struck the bow of the Blaireau, carried away her bowsprit and cutwater close to the seam of the stem, started three planks of the bends, and all above them, and crushed to pieces the larboard cathead. Before morning there were three and a half feet of water in the hold, and the Spanish commander not being able to wait for an attempt to repair the Blaireau, he took her crew and passengers on board his ship, excepting one man, Thomas Toole, an

---

[1] [Affirmed in part by supreme court in 2 Cranch (6 U. S.) 240.]

Irishman, who could not be found, as it was alleged by the officers and crew of the Blaireau in their protest, but who was, as he himself alleged, prevented by force from getting into the first boat, and afterwards refused to go in the second boat, being determined to remain on board the Blaireau. Toole, being thus left alone, cut away, as he alleged in his libel, the anchors, and the bowsprit, (which had been left hanging,), to lighten her bows, put her before the wind, and hoisted a signal of distress. In this situation she was, the next day, found and boarded by the ship Firm bound on a voyage from Lisbon to Baltimore. The persons on board of the Firm were: Charles Christie, one of the charterers of the ship. William Mason, master. William Stevenson, mate, shipped at £4 sterling per month. John Falconer, carpenter, at £5. 5. 0. Daniel Ross, boatswain, £2. 10. 0. George Glass, cook, £2. 10. 0. Samuel Monk, Martin Burk, John Brown Hall, John Blackford, John Wilson, and Mark Catlin. mariners, £2. 0. 0. Joachim Daysontas, a boy, £1. 1. 0. John Moat and John M'Mon, apprentices to the owners of the Firm. And Negro Tom. a slave of the Rev. Mr. Ireland.

It was admitted that the ship Firm is about the burden of 330 tons, carpenters' measure, but 500 tons can be laden on board of her; that she is of the value of ten thousand dollars, and is owned by John Jackson, of London. but chartered to Charles B. Young and Charles Christie, who had a cargo of salt on board, of the value of 4,000 dollars. The proper complement of men to navigate the Blaireau was at least sixteen hands. She was a faster sailer than the Firm. They laid to together for two or three days during the bringing in the Blaireau, for the purpose of taking out part of her cargo, and rendering assistance from the Firm. The sum of £2,000 sterling was insured upon the Firm to cover her value and freight.

Upon taking possession of the Blaireau she had about four feet of water in her hold, and could not have swam more than twelve hours longer. There was great risk and peril in taking charge of her. She was brought into the Chesapeake Bay after a navigation of nearly three thousand miles, by six persons who went on board of her from the Firm, and the man who was found on board. Part of her cargo was taken out to lighten her forward. and put on board the Firm; and part of it shifted aft. The Blaireau was navigated by the people of the Firm without boat or anchors. She was obliged to be pumped in fair weather by all hands every two, three or four hours, half an hour at a time, and in blowing weather every hour, a quarter of an hour at a time. Her bow was secured by coverings, of leather, copper and sheet lead nailed on, and pitch and turpentine in large quantities poured down hot between the planks and the coverings. The labor of working the Blaireau by the men on board was great and severe, and they had frequently thought of

abandoning her, but fortunately persevered. She was a slight built vessel and constructed without knees, and was very weak. The forestay was gone, and the foremast was secured by passing a large rope through the hawse holes, and securing it to the foremast head. It was the opinion of several experienced sea captains that the bringing in the Blaireau was a service of great risk and peril, and nearly desperate, and such as they would not have undertaken.

The persons who went on board the Blaireau from the Firm were, Charles Christie, super-cargo, and one of the charterers of the Firm; William Stevenson, first mate; John Brown Hall, and John Wilson, seamen; John Moat, a boy, and Negro Tom. Mason, the master, and Stevenson, the mate, were the only persons capable of taking an observation and navigating the vessels or either of them, into port.

A claim was put in by the French consul in behalf of the owners of the Blaireau. It appeared in evidence that William Mason, the master of the Firm, had embezzled part of the cargo of the Blaireau, to the amount of at least 1,760 dollars and 71 cents.

WINCHESTER, District Judge. The counsel for the parties respectively intervening in this cause were heard by the court, and their argument, together with all and singular the proceedings and testimony in this cause, were by the court maturely considered. And it appearing to the court that the circumstances of extreme danger under which the salvage of the ship Blaireau and cargo were effected, required a salvage and compensation as liberal as is consistent with precedents and legal principles; that the danger, labor and service of the persons actually employed in navigation and bringing in the said ship, greatly exceeded the danger, labor and service of the persons who remained on board the ship Firm; and that their compensation should exceed at the rate of fifty per cent. the compensation of those who remained on board the ship Firm; that among the persons on board the Blaireau, the station, trust and services of William Stevenson and Charles Christie, entitle them to a compensation exceeding that of seamen, at the rate of 50 per cent., and that the apprentices, cook, and negro slave should not be classed with seamen, nor seamen with the carpenter and second mate, and there not being any general rule by which to settle the proportions of salvage among persons of those different stations, but that the same must depend upon the sound discretion of the court, applied to the circumstances of every particular case; that William Mason, captain of the said ship Firm, having fraudulently embezzled and secreted, with intent to appropriate the same to his own use, lace, and other articles of a large value, which constituted a part of the cargo of the said ship Blaireau, is not entitled to any salvage or other compensation; that in strictness the officers and crew are the only salvors; and the owners of the ship Firm and cargo, as such can only come in for any share of salvage, upon the consideration of the risk to which their property was exposed; that upon these principles salvage should be paid to and among the persons entitled thereto, at the rate of three fifths of the net proceeds of the sales of the said ship and cargo; and that of this sum one-ninth part of the net salvage will be a just and liberal compensation to the owners of that ship and her cargo for any hazard to which their property was exposed.

It is, this 14th day of July, 1803, by me, JAMES WINCHESTER, judge of the district court of the United States, for Maryland district, and by the power and authority of this court, ordered, adjudged and decreed, that the net amount of sales of the said ship Blaireau, her tackle, apparel, and furniture and cargo, (after deducting the costs in the cause, and the sum of three hundred and eighty-eight dollars, heretofore decreed by consent to Charles Christie for expenses and disbursements relative to the said ship Blaireau and cargo,) amounting, as stated by the clerk of this court, to the sum of sixty thousand two hundred and seventy-two dollars and sixty-eight cents, shall be paid, applied and disposed of, to and among the persons, and in the manner following, to wit: To the owners of the ship Firm and cargo, the sum of four thousand and eighteen dollars and fourteen and three quarters cents, to be divided between them in the proportions of their respective interests agreeably to the admitted estimation thereof. to wit: To the owners of the ship Firm, for the value of the said ship and freight on eighteen thousand dollars; and, to the owners of the cargo of the said ship on four thousand dollars. To the persons on board the said ship Blaireau, as follows, to wit: To William Stevenson, the sum of three thousand four hundred and three dollars, and sixty-three and a quarter cents. To Charles Christie, the sum of three thousand and four hundred and three dollars and sixty-three and a quarter cents. To Brown Hall, John Wilson and Thomas Toole, seamen, each the sum of two thousand two hundred and sixty-nine dollars and eight and three-quarter cents. To John Moat, an apprentice boy, the sum of eleven hundred and thirty-four dollars and fifty-four and three-quarter cents. And that there be retained a like sum of eleven hundred and thirty-four dollars and fifty-four and three quarter cents in this court, to and for the benefit of such person or persons as may hereafter make title to the same as owner or owners of the said Negro Tom. To the persons on board the said ship Firm, as follows, to wit: To John Blackford, second mate, the sum of eighteen hundred and ninety dollars and ninety and three quarter cents. To John Falconer, carpenter, the sum of eighteen hundred and ninety dollars and

ninety and three quarter cents. To George Glass, the cook, and John M'Mon, an apprentice, each, the sum of seventeen hundred and fifty-six dollars and thirty-six and three quarter cents. To Daniel Ross, Samuel Monk, Martin Burk, Mark Catlin, and Joachim Daysontas (sailors of the Firm), the sum of fifteen hundred and twelve dollars, and seventy-three cents each. That no salvage or compensation whatever shall, for the cause above recited, be paid to the said William Mason, but that the libel in this cause filed, so far as it relates to the claim of the said Mason personally and only, shall stand, and the same is hereby dismissed.

And it is by these presents further ordered, adjudged, and decreed, that the residue of the proceeds of the sales aforesaid shall be deposited in the Bank of Baltimore, in the name of this court, and to the credit of this cause, to the use and the benefit of such person or persons as may in this court make title thereto, as owner or owners of the said ship Blaireau and cargo, or such person or persons as may be legally authorized by them to receive the same.

From this decree, an appeal to the circuit court was prayed by William Mason, the master of the Firm; by the owner of the Firm; by the claimants of the Blaireau, and by the charterers of the Firm.

Upon the appeal, additional testimony was adduced, in the circuit court, but it does not seem to affect the principles upon which the rates of salvage ought to be awarded.

On the 27th of December, 1803, the circuit court, held by CHASE, Circuit Justice, decreed as follows: The court having heard the parties on the appeal in this cause, by their counsel, and fully examined the evidence, exhibits and proofs, and maturely considered the same, do order, adjudge and decree, and it is hereby ordered, adjudged and decreed by the said court, that the decree of the said district court be, and hereby is in all things affirmed, (and, with respect to the said Mason, with the costs of his appeal,) except only so far as the said decree shall hereinafter, by this decree, be changed or altered.

And it is now further ordered, adjudged and decreed by this court as follows, to wit: That there be paid to John Jackson of St. Paul's parish in the county of Middlesex, in the United Kingdom of Great Britain and Ireland, (who appears to this court to be the owner of the ship Firm,) the sum of two thousand eight hundred and seventy dollars twelve cents and eight dimes, on the amount of the value of the said ship estimated at the sum of ten thousand dollars.

That there be paid to Charles Bedford Young and Charles Christie, Jun. (who appear to this court to be the owners of the cargo on board the said ship Firm) the sum of one thousand one hundred and forty-eight dollars and five cents on the amount of the value of the said cargo, estimated at the sum of four thousand dollars.

That there be paid to William Stevenson, the sum of two thousand two hundred and sixty-nine dollars eight cents and nine dimes.

That the salvage money adjudged by the district court, and affirmed by this court to be paid to John Moat, (who appears to this court to be an apprentice to the above-named John Jackson, owner of the ship Firm,) be paid by the clerk of this court to the said John Moat, or to his proctor or attorney in fact for the use and benefit of the said John Moat; and that the said salvage money be not paid to the said John Jackson, or to his attorney, or to any other person or persons whatsoever, who shall claim the said salvage money as owner or master of the said apprentice; and that the said salvage money remain in court until paid according to this decree.

That the salvage money adjudged by the district court, and affirmed by this court, to be paid to John M'Mon, (who appears to this court to be an apprentice to the above-named John Jackson,) be paid by the clerk of this court to the said John M'Mon, or to his proctor or attorney in fact, for the use and benefit of the said John M'Mon; and that the said salvage money be not paid to the said John Jackson, or to his attorney, or to any other person or persons whatsoever, who shall claim the said salvage money as owner or master of the said apprentice; and that said salvage money remain in court until paid according to this decree.

That the salvage money adjudged by the district court, and affirmed by this court, to be retained for the owner of Negro Tom, be paid to the Rev. John Ireland, (late of this state, but now of the United Kingdom of Great Britain and Ireland,) who appears to this court to be the owner of the said Negro Tom, or to the Rev. Joseph G. I. Bend, and Lewis Atterbury, who appear to this court to be the attorneys in fact of the said John Ireland, and who have expressed in writing to this court, that they, being duly authorized by the said John Ireland, will immediately, on the receipt of the said salvage money, manumit the said Negro Tom, according to the law of the state of Maryland, and will pay the said Negro Tom one-fifth part of the said salvage money, and have consented that the same may be retained by the clerk of this court for the use of the said Negro Tom.

And it is further ordered, adjudged and decreed, that the appellants (except William Mason) pay no costs in this court on the appeal.

Upon this judgment separate writs of error were sued out by William Mason. the master, John Jackson, the owner, William Stevenson, the mate, Charles Christie and Charles B. Young, the charterers of the Firm, and by the French claimants of the Blaireau.

William Mason assigned for error, that no part of the salvage was decreed to him for his own use, on account of his merits and services.

John Jackson, the owner of the Firm, assigned for error, that he was not allowed a reason-

able proportion of salvage; that the whole sum allowed and decreed to the owner and freighters, ought to have been decreed to him; and that the sums decreed to the two apprentices ought not to have been ordered to be paid to themselves or their proctor only.

William Stevenson, the mate, assigned for error, that the share assigned him was inadequate to his services, merits and situation.

Christie and Young, the freighters of the Firm, alleged that the proportion allowed to the owner and freighters of the Firm was too small, in proportion to their risk; and that the proportion awarded the freighters was too small compared with that awarded to the owner.

[The judgment of the circuit court was affirmed in part by the supreme court, where it was carried by writ of error. 2 Cranch (6 U. S.) 240.]